IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 05-cv-00877-PSF

CHERILYN HAALAND,

      Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner of Social Security,

      Defendant.

---

## ORDER ON SOCIAL SECURITY APPEAL

---

This matter was set for oral argument on February 13, 2006 at 8:30 a.m., which date was VACATED by Order dated February 9, 2006 (Dkt. # 16).  The Court has received the arguments and submissions of counsel, and enters the following Order.

**BACKGROUND**

Plaintiff Cherilyn Haaland appeals from the decision of the Commissioner denying social security disability benefits. The decision of the Commissioner became final on March 17, 2005 when the Appeals Council notified plaintiff that it found no reason to review the decision of the Administrative Law Judge, which had been entered on June 5, 2003.  Plaintiff timely filed her appeal from the final decision of the Commissioner on May 13, 2005.  The Court has jurisdiction to review the final decision of the Commissioner of Social Security under 42 U.S.C.§ 405(g).

Plaintiff filed her claim for benefits on February 4, 1998, seeking disability benefits beginning December 5, 1992, due to fibromyalgia[1], chronic fatigue syndrome, irritable bowel syndrome and migraine headaches.  Upon review her application was denied by the Administrative Law Judge on September 8, 1999 (AR[2] 248-55).  On August 31, 2001, the Appeals Council granted review of the decision and remanded the matter to the ALJ directing: (1) that he give further consideration to plaintiff's maximum residual functional capacity during the entire period at issue (the period beginning on and prior to the date the earnings requirements were last met on March 31, 1996 and continuing), and (2) obtain evidence from a medical expert to clarify the nature and severity of plaintiff's combination of impairments (AR 266).

In accordance with that order, a further hearing was held on November 8, 2002 before the ALJ, at which time plaintiff appeared represented by counsel.  Also appearing at the hearing was a vocational expert, Nora Dunne, and the plaintiff's physician, Dr. Philip George Kiely (AR 537-603).  On June 5, 2003, the ALJ issued his decision denying plaintiff's disability claim (AR 38-49).

On September 15, 2004, the Appeals Council again remanded the matter to an ALJ because it was unable to locate the tape of the November 2002 hearing (AR 19-

---

[1]   Fibromyalgia is defined as a disorder characterized by muscle pain, stiffness and easy fatigability.  The cause is unknown and an estimated three million are affected in the USA. http://cancerweb.ncl.ac.uk/cgi-bin/omd?fibromyalgia.

[2] The Administrative Record in this case (AR) consists of one volume, pp. 1-603.

20).  The tape was subsequently located and by order of February 23, 2005 the

Appeals Council vacated its prior remand order (AR 15-16).  On March 17, 2005, the

Appeals Council issued its final denial of review and thereafter plaintiff filed her appeal.

 **THE ALJ'S DECISION OF JUNE 5, 2003**

In his written decision of June 5, 2003, the Administrative Law Judge denied

plaintiff's application for benefits at step five of the five-step process.  *See generally*

*Williams v. Bowen,* 844 F.2d 748, 750-52 (10th Cir. 1988).  In reaching his

determination, the ALJ found plaintiff was suffering from fibromyalgia, an impairment

which caused more than a minimal effect on her physical or mental ability to perform

basic work-related activities (AR 39).  The ALJ nonetheless found that plaintiff's

condition did not meet the listed impairments of Appendix 1 to Subpart P of the Social

Security regulations (AR 40), a finding which plaintiff apparently does not challenge on

this appeal.  He also found that plaintiff did not suffer from any severe mental

impairment (AR 39), again a finding which plaintiff apparently does not challenge on

this appeal.  Although the ALJ did not specifically address plaintiff's other potential

impairments, he implicitly did not find a basis for such claims.  Again plaintiff apparently

does not challenge such finding on this appeal.

The ALJ found that plaintiff met the disability insured status on December 5,

1992, the date on which she claimed she became unable to work, and remained

insured through March 31, 1996 (AR 48).  He also found that she had not engaged in

substantial gainful activity since December 5, 1992 (*id.*).

The ALJ determined that notwithstanding her impairment due to fibromyalgia, plaintiff had the residual functional capacity during the period from December 5, 1992 through March 31, 1996 to stand and walk for forty minutes at a time and sit for twenty minutes at a time "with postural shifts and changes as needed." (AR 45, 48).  He also found that she was able to perform sedentary to light work within these restrictions. He found that she was able to push and pull occasionally, and occasionally climb ramps and stairs, balance, stoop, crouch and crawl.  She was not able to climb ladders, ropes and scaffolding.  She was able to occasionally reach, handle and finger bilaterally.  She needed to avoid concentrated exposure to extreme cold, hazards and work at heights (*id.*).

The ALJ concluded that as a result of these limitations and impairments plaintiff could not return to her past relevant work, which although not specified in the ALJ's decision is agreed by the parties to be the profession of optometry (Plaintiff's Brief at 1-2; Defendant's Response at 2).  The ALJ found that plaintiff's past relevant work as an optometrist required her to reach, handle and finger more than occasionally, and thus she could not return to such work (AR 45).

He thus concluded that "[a]lthough claimant was unable to perform the full range of light work, she was capable of making an adjustment to work which existed in significant number is the national economy."  AR 49.  Based on testimony from the vocational expert, the ALJ found that such other work included employment as a call out operator, surveillance system monitor, information clerk and furniture rental

consultant (*id*.).  Accordingly, the ALJ determined that plaintiff was not disabled as

defined in the Act *(id*.).

**PLAINTIFF'S APPEAL**

On appeal plaintiff argues that substantial evidence in the record does not

support the ALJ's determination for several reasons.  She argues that the ALJ did not

give proper weight to the opinions of plaintiff's treating physician, Dr. Kiely, who

appeared and testified at the hearing on November 8, 2002 (Plaintiff's Brief at 13-16).

She also argues that the ALJ erroneously based his determination of her RFC on his

own assumptions about her rather than upon the evidence before him (*id.* at 10-13).

She further argues that the ALJ misstated several pieces of evidence in his opinion

(*id.* at 16-17).  Moreover, plaintiff argues that there was insufficient evidence of record

that plaintiff could perform the jobs that the ALJ found she could do, and in any event,

there was insufficient evidence to show that such jobs existed in significant numbers in

the regional or national economy (*id.* at 5-10).

**ANALYSIS**

**A.    Whether Proper Weight was Given to the Treating Physician Opinions**

The Court starts from the proposition, recognized by the Appeals Council and

the ALJ, that the relevant period for considering plaintiff's claim of disability is the

period between December 5, 1992 through March 31, 1996, the only period through

which she was insured.[3]  Thus, the Court agrees with the ALJ's refusal to credit the

---

[3]  In denying review of plaintiff's appeal in its letter dated March 17, 2005, the Appeals Council stated that it rejected the new medical evidence submitted by plaintiff because it related to a time after March 31, 1996 (AR 9).

5

medical opinion of Dr. Rook, who opined in March 1999 that plaintiff was not able to engage in competitive employment, as the ALJ found that Dr. Rook had no knowledge of the plaintiff's actual condition and functioning during the relevant time period (AR 42).  To be consistent, however, the Court finds that the ALJ should have similarly given little or no weight to the statements by Dr. Cucuzella, found at AR 126-27, regarding the status of plaintiff's fibromyalgia, as these too were outside the relevant period, coming in January 1997 and April 1997, as the ALJ found.[4]  *See* AR 42.

     1.  <u>The medical evidence in the record</u>

Some factual background is necessary in order to put into perspective plaintiff's assertion that the ALJ did not give proper weight to the opinions of treating physician Dr. Kiely.  The evidence shows that plaintiff is the wife of a United States Air Force Lieutenant Colonel, who was assigned as a professor of physics to the Air Force Academy in Colorado Springs, Colorado (AR 499, 570).  In or about August 1992, plaintiff accompanied her husband when he was transferred overseas to an Air Force posting in the United Kingdom (AR 163).  As of August 1992, plaintiff's medical records indicate that she was being treated for fibromyalgia (*id.*).

---

[4]  The ALJ apparently read the date of the notes appearing at AR 126 as January 1997, but the handwriting is not clearly legible.  From the arrangement of Exhibit 5F, in which the notes are contained, and from the Court's reading of the handwriting, the Court believes these notes were made in June 1997, rather than in January 1997, putting them even farther from the relevant period.

After the transfer to England, plaintiff came under the care of Dr. Kiely, an Air Force physician and family practitioner.[5] He apparently first saw her in November 1992, when he treated her for stomach pain which he suspected to be ulcers (AR 162, 543). Dr. Kiely saw plaintiff in March 1993, when he began to treat her condition of fibromyalgia (AR 160, 544). Clinic notes from April 7, 1993 indicate plaintiff suffered exacerbation of the fibromyalgia, and the examining physician observed "trigger points"[6] apparently in the paraspinal region (AR 159). A similar observation was made on April 23, 1993 (AR 158). Medical notes of June 14, 1993 reflect that plaintiff reported that she had a "bad week," apparently associated with her fibromyalgia (AR 157).

The Court will not detail all the medical notes that appear in the record, as Dr. Kiely's medical summary of October 1995 adequately describes plaintiff's condition. In it he states that plaintiff suffers from fibromyalgia (AR 135), a conclusion which the ALJ accepted (AR 43). Dr. Kiely reported in his medical summary, on a date long before plaintiff made her disability claim, that plaintiff "suffers from periods of severe pain which involve not only the central muscles, but also the upper and lower

---

[5]   The records of Dr. Kiely's treatment of plaintiff, and his opinions regarding the same, are found in his clinic notes (AR 139-62), in a medical summary he wrote dated October 11, 1995, when plaintiff was moving back to the United States (AR 135-138), in a letter he authored dated October 23, 1999 (AR 312-17) and in his testimony given at the hearing on November 8, 2002 (AR 541-568).

[6]   A trigger point is defined as a specific point or area where, if stimulated by touch, pain, or pressure, a painful response will be induced. http://cancerweb.ncl.ac.uk/cgi-bin/omd?trigger+point

extremities, including the hands and feet." (AR 135).  He further states that restorative

sleep does not prevent exacerbations of the pain, and does not decrease the pain (*id.*).

Dr. Kiely also commented that plaintiff's daily schedule "involves vigorous

walking, which helps to decrease her pain or occupy her mind when 'nothing helps the

pain.'"  (*Id.*)  He reported that "[l]ack of exercise, or prolonged sitting/travel/ stationary

positions exacerbate her pain and increases her anxiety."  *Id.*  Thus Dr. Kiely

summarized her "current therapies" as including exercise, massage, yoga, and

medications including elavil, prozac, other narcotics including darvocet, klonopin and

Ben-Gay type cream (AR 135-36).

In providing his prognosis, Dr. Kiely stated that plaintiff worked "diligently to

retain control over her condition through exercise and Yoga," and because of this she

is a very high-functioning individual and her prospects are good (AR 136).  In his

summary, Dr. Kiely reported that plaintiff had volunteered to work in the Air Force clinic

as an optometrist, and the "flexible schedule" permitted her to retain her skills and

licensure, "but not exacerbate her problems." (AR 135).  In his prognosis, Dr. Kiely

pointed out that plaintiff is unsure of her abilities to ever return to full-time or regular

employment (AR 137).

After her return to the United States in the Fall of 1995, plaintiff was under the

care of a Dr. Guerra, who apparently saw her on December 19, 1995, January 11,

1996, February 6, 1996 and March 8, 1996, and on each occasion noted plaintiff's

condition of fibromyalgia and apparently continued her drug therapy (AR 132-34).

In February 1996, Dr. Guerra apparently referred plaintiff to Dr. Sayers, a rheumatologist, who noted that "she has longstanding fibromyalgia." (AR 123).

Dr. Sayers examined plaintiff on February 15, 1996, reporting that she claimed to be suffering from "whole body aches." (AR 119). He noted that her symptoms are aggravated by a static position (*id.*). He noted that she was active and gets good aerobic exercise and "is very active in yoga." (*Id.*) His examination indicated that she has some tender points although not numerous ones (AR 121). He recommended that she undergo some blood tests and return in two months, *id.,* although it is unclear whether she did. Nonetheless, on or about March 21, 1996, Dr. Sayers completed a form for plaintiff in connection with her effort to cancel a student loan, in which he stated that she was "totally and permanently disabled." (AR 229). The ALJ gave no credit to this statement (AR 42).

Against this background, the ALJ found in his first determination, issued on September 8, 1999, that plaintiff retained the residual functional capacity to perform the exertional demands of light work, and therefore she could return to her past relevant work as an optometrist (AR 253-54). As noted, plaintiff appealed that determination to the Appeals Council. In connection with her appeal, plaintiff submitted a letter from Dr. Kiely dated October 23, 1999, in which he addressed some of the findings made by the ALJ (AR 312-317).

Dr. Kiely points out in his letter that he was plaintiff's personal physician from 1992 until Fall of 1995 (AR 312). That during that period he observed her on a daily basis, as her physician, as she worked in the clinic, and as her neighbor. (*Id.*) Dr.

9

Kiely stated that plaintiff's volunteer efforts in the clinic were appreciated, "but were inconsistent and could not be relied upon in any predictable way."  (AR 313).  He further opined that plaintiff "would certainly not ever be able to have been [sic] employed by any employer who requires regular attendance at work."  (*Id.*)  He further opined that plaintiff was "intermittently totally disabled from most activities in an unpredictable and recurring fashion." (AR 315).  He further explained that "[r]egular walking" is the most commonly prescribed therapy for fibromyalgia (AR 314) and that plaintiff's plaintiff's walking, hiking or riding a horse are activities that constitute treatment, and help her overall symptoms (AR 315).  His letter essentially suggests that plaintiff must have flexibility to engage in these types of activities to alleviate her pain, and he concluded that most employers would not allow such sporadic employment and activities in a full-time employee (AR 315-16).  Specifically, Dr. Kiely stated that plaintiff needs to have the "ability to leave a job *on any day at any time for an indeterminate length due to overwhelming fatigue and pain which will cause a marked deterioration of her function if not granted.*" (AR 316) (emphasis in original).

As noted, after the remand by the Appeals Council, Dr. Kiely testified at the hearing before the ALJ on November 8, 2002.  Based on his review of his records and his memory, Dr. Kiely testified that plaintiff met the criteria of the American College of Rheumatology for a finding of fibromyalgia, as she had tender points in 18 out of the 18 locations specified for testing for fibromyalgic discomfort (AR 553).  He also testified, reiterating what he wrote in his October 1999 letter, that it was his opinion that plaintiff could not work on a full-time basis due to her complaints of pain, her pattern of fatigue,

and the natural history of fibromyalgia (AR 557).  He also explained that her work at the clinic in England was on a voluntary basis, and what she would do, and how often she would do it, "were totally up to her." (AR 558).  He observed that at that time "she couldn't sit still for very long.  Sitting still caused increased pain and she often had times [when she] had to keep moving as a way of dealing with the pain."  (AR 558).

Dr. Kiely also testified that the amount of time plaintiff could tolerate sitting at one interval was 15 to 25 minutes, and during an eight-hour day her total ability to sit would be two to three hours (AR 559).  He testified that ten pounds was the most weight she could lift repetitively, and perhaps 60 pounds occasionally (*id.*).  He testified she could occasionally reach, handle and finger (AR 560).  He testified that in his opinion her condition would deteriorate if she attempted to work a 40-hour week.  This opinion was based on his observations of her at the clinic, where it would not take long before she would call in ill due to extreme fatigue or too much pain, or because she was taking high levels of analgesia "that would make her not the best employee." (AR 561).  He also testifies that exposure to extremes of hot and cold would bring on problems with fatigue and pain (*id.*).

In response to further questioning from the ALJ, Dr. Kiely testified that when he was observing her in 1995, he noticed that she stood still only infrequently, as it was "very difficult for her." (AR 562).  He testified that "at work, she would be sitting, and then she would be moving around." (AR 562).  The ALJ characterized this answer as "alternating her postural pose" for lack of a better term, between sitting, standing and walking (*id.*).  In response to a question about his familiarity with plaintiff's daily routine,

Dr. Kiely testified that "in order for her to do well in a day she needed to take a walk and walk a varying length. . . . [T]hat's the type of activity that seemed to do best for her condition which is also typical of fibromyalgia." (AR 563).  With respect to standing and walking at work, Dr. Kiely stated that his opinion was that plaintiff was limited to two hours or less per day (AR 566).  He also stated that if plaintiff attempted to work an eight-hour day, she would need to be able to lay down, but that such lying down could not be "scheduled" around lunch or work breaks (AR 567).

Dr. Kiely was also questioned about whether he would equate the physical demands of taking care of children with the demands of work, to which he demurred (AR 567).  He acknowledged that he was a personal friend of plaintiff and visited her socially since they had returned to the United States (AR 555-56).

     2.   <u>The ALJ'S review of the medical evidence</u>

The ALJ accepted some of the opinions offered by Dr. Kiely but rejected others. The ALJ agreed with Dr. Kiely's diagnosis that plaintiff was suffering from fibromyalgia (AR 43).  He also accepted Dr, Kiely's restriction on plaintiff's ability to sit, finding that she could sit only twenty minutes at a time (AR 45), as well as his restriction on plaintiff's ability to only occasionally reach, handle and finger (*id.*).  The ALJ accepted Dr. Kiely's restriction that plaintiff should not be exposed to extremes of hot and cold (*id.*).  The ALJ also found that plaintiff retained the residual functional capacity to stand and walk forty minutes at a time (*id.*), a restriction to which Dr. Kiely did not testify. However, the ALJ did not find a restriction based on total time sitting, standing or walking during a work day, although Dr. Kiely did state that in a work context plaintiff

could not sit, stand or walk more than two hours in a day (AR 559, 566).  The ALJ

concluded by saying that "[e]xcept for the limitation of no full time work which is not

supported by the record, this residual functional capacity largely reflects the claimant's

own testimony as to her abilities and the restrictions of Dr. Kiely." (AR 45).

The ALJ directly took specific issue with some of Dr. Kiely's opinions expressed

in his letter of October 23, 1999.  *See* AR 43.  The ALJ gave the following reasons for

not accepting the opinions of Dr. Kiely as a treating physician.  The ALJ stated that he

was discounting the doctor's opinion because the ALJ felt his opinions were "colored by

his personal relationship" with plaintiff (AR 43).  He also found that Dr. Kiely's opinions

were stated in "generalities" that "may be enlightening as to the impairment itself" but

did not "speak directly to" plaintiff's functioning (*id.*).  He also took note that Dr. Kiely

disagreed with the ALJ's assessment that plaintiff's adoption of a child and ability to

perform childrearing activities were indicative of her perception of her own capabilities

(AR 43).  The ALJ stated that he did not find Dr Kiely "fully credible" for the above-

stated reasons (AR 44) and because he found that the opinion given at the hearing was

given "retrospectively"  and his "contemporaneous records" do not contain similar

restrictions (AR 44).

3.    Application of the regulations

As plaintiff correctly states, the social security regulations expressly provide that

the opinion of a treating physician, such as Dr, Kiely, is entitled to "more weight"

because it "may bring a unique perspective to the medical evidence that cannot be

obtained from the objective medical findings alone or from reports of individual

examinations," 20 C.F.R. § 404.1527(d)(2).  If the treating physician's opinion is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques

and is not inconsistent with the other substantial evidence in [the] case record," it is to

be given "controlling weight."  If the treating physician's opinion is not given controlling

weight, the Commissioner must still give it some weight upon application of the factors

listed in 20 C.F.R. § 404.1527(d)(2)(I) and (ii), as well as paragraphs (d)(3) through (6).

Finally, the Commissioner must always give "good reasons" for the weight given to the

treating source's opinion.

This Court agrees with plaintiff that the ALJ did not give proper weight to the

medical opinion of Dr. Kiely.  Had proper weight been given to such opinion, the ALJ

could not have concluded that plaintiff had a residual functional capacity to fill any job

in the local or national economy.

As noted above, the ALJ accepted much of Dr. Kiely's opinion as to the

restrictions on plaintiff.  He rejected, however, Dr. Kiley's opinion that plaintiff could not

work full-time.  As the Court understands Dr. Kiely's opinion, he is essentially stating

that plaintiff is restricted from a work situation where she would have to sit, stand or

walk for long periods of time, at least no more than two to three hours per day, without

moving around and taking walks;  that her attendance at work is unpredictable as her

pain and fatigue are unpredictable; and that she therefore could only work in a situation

where she had the flexibility to meet her needs to move around or miss work as

required.  In the opinion of this Court, the same medical and observation evidence that

supports the restrictions the ALJ accepted from Dr. Kiely would also support the conclusions by Dr. Kiely set forth above.

Moreover, as specified in the regulation and as held in the case law, "[w]hen an ALJ decides to disregard a medical report by a claimant's physician, he must set forth 'specific, legitimate reasons' for his decision." *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).  Here, the ALJ did not give any reason for not accepting Dr. Kiely's opinions other than the long-standing personal relationship between them and the assertion that Dr. Kiely's contemporaneous records "do not contain similar restrictions" (AR 44).

Application of the above-cited regulation to the first reason given would appear to support the opposite result.  First, 20 C.F.R. § 404.1527(d)(2)(I) provides that in weighing the length of the treatment relationship, "the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."  Second, 20 C.F.R. § 404.1527(d)(2)(ii) provides that in weighing the nature and extent of the treatment relationship, "the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion."  The fact that Dr. Kiely knew plaintiff well, including socially, observed her frequently both in the clinic and outside, and gained substantial knowledge about her condition would appear to bolster the weight to be given to his opinion, not diminish it.

This is not to say that if the treating physician is suspected of fabricating or shading opinions for his patient's case he must be believed.  But here there is no such

15

evidence of fabrication or shading.  Moreover, neither the ALJ nor the Commissioner

has cited to any regulation or case authority that permits rejection of a treating

physician's opinion based on a friendly relationship with his patient absent any

indication of collusion or favoritism.

There is no dispute that plaintiff suffered from fibromyalgia long before she

began treatment with Dr. Kiely.  Moreover, the contemporaneous notes of visits

between November 1992 and March 1993 expressly support his diagnosis of

fibromyalgia.  Dr. Kiely's contemporaneous memorandum of October 11, 1995, written

on a date time long before plaintiff made her claim for disability in 1998, documents

plaintiff's complaints of "severe pain" in the central muscles, upper and lower

extremities, her pursuit of a daily schedule of vigorous walking, the exacerbation of

pain by prolonged sitting/travel/stationary positions, and her need for a flexible

schedule (AR 135).  These observations, recorded by Dr. Kiely at the time he was

treating plaintiff in England, are the same factors on which he relies to give his opinions

in 1999 and again in 2002 that plaintiff is not able to work full-time due to her inability to

work on a set schedule.

For these same reasons, the Court cannot agree with the ALJ that Dr. Kiely's

contemporaneous records do not support his later conclusions.  To be sure, in his

testimony on November 8, 2002, Dr. Kiely quantified the restrictions on plaintiff's ability

to sit, stand and walk and expressed limitations on her ability to finger, reach and

handle, as well as to lift weight, in ways that were not expressly found in his earlier

records.  But the Court does not find any inconsistency between the quantifications

16

elicited from Dr. Kiely at the hearing, which were due primarily to the social security setting in which he was testifying, and the narrative limitations implicit in his clinical observations.  *Cf.* 20 C.F.R. § 404.1527(d)(4).

Moreover, equally persuasive of the weight to be given Dr. Kiely's opinion is the lack of contrary medical evidence in the record.  While the regulations state that a treating physician opinion may not be entitled to controlling weight if it is not well-supported by medically acceptable clinical and laboratory techniques, or is inconsistent with other substantial evidence, such a finding requires contradictory medical evidence in the record.  Here, the Court finds little or no medical evidence in the record that contradicts Dr. Kiely's opinions.

As noted above, the ALJ does cite to two clinical notes from 1997 that refer to plaintiff's fibromyalgia as being "stable" (AR 42), but as the Court has stated, such notes are outside the relevant time period.  Moreover, they are so brief and cryptic as to not appear to have been based on clinical techniques nor, for that matter, are they particularly descriptive.

The ALJ also states that he "has considered the administrative findings of fact made by the State agency medical physicians and other consultants." (AR 45). Although he does not summarize what these findings are, presumably the ALJ cites these to support his conclusion.  However, the ALJ does not cite to the place in the record where these findings may be found.[7]  Without some explanation of what these

---

[7]   The Commissioner's brief on appeal is not much more helpful to the Court in locating these supposed findings.  That brief cites to a "consultative examination" performed in January 2001 by a Dr. Terry Struck (Defendant's Brief at 6) but is not clear that this is what the ALJ was

findings are, or even where they might be found in the record, the Court does not know

what the ALJ is referring to, nor whether these findings constitute acceptable medical

opinions.  *See* 20 C.F.R. § 404.1527(a)(2).

In an effort to discern what the ALJ was referring to, the Court has reviewed the

earlier written determination issued by him on September 8, 1999, and finds in that

decision similar language to that found in his latter decision referencing findings by

state agency medical consultants (AR 253).  It appears that the ALJ may have been

citing there to a residual functional capacity assessment of plaintiff performed by a

state examiner on February 27, 1998, shortly after she filed her claim.  This RFC

assessment, labeled as Exhibit 6F in the record, is found at AR 201-08.  That

assessment concluded that while plaintiff should avoid heavy work, "she should be able

to perform [the] max[imum] of medium work (avoiding [a] cold environment.)"  (AR 206).

It also states that she could stand, sit or walk for 6 hours in an eight hour day, with

"postural shifts & normal breaks." (AR 202).

However, the ALJ himself, in his decision of September 8, 1999, states that

"evidence received into the record after the reconsideration determination (exhibits

7F-14F) and the claimant's testimony provide some new and material information that

alters the findings about the claimant's residual functional capacity to the extent of

_____

referring to.  The Commissioner contends that the Struck report, found at AR 358-63, states
that plaintiff's physical examination "was essentially normal." *Id.*  The Court does not read the
report that way.  In any event, the Struck report makes no findings or conclusions about
plaintiff's ability to sit, stand or walk for prolonged periods of time, much less her ability to work
full-time.  The brief also cites to the review of "two state agency physicians" performed in
"February and in April 1998" (Defendant's Brief at 17 citing to AR 201-08).  As discussed
below, there was only one actual review performed.

lowering it to the light exertional level." (AR 253).  Because this RFC of February 1998 was thus discounted in the first decision, the Court finds that it does not supply medical evidence contrary to or inconsistent with the opinion of Dr. Kiely.  Thus, even if this is what the ALJ was referring to as "administrative findings of fact made by the State agency medical physicians and other consultants," it does not change the opinion of the Court that there was no contrary medically acceptable clinical findings to be found in the record to contradict Dr. Kiely's opinion as treating physician.

In addition, the Court notes that in rejecting Dr. Kiely's opinions, and in finding that plaintiff was capable of performing light work, the ALJ put considerable weight on the fact that plaintiff had adopted children and his own observation that plaintiff's activities in caring for the children was comparable to engaging in light work.  It was apparent that the ALJ took umbrage with Dr. Kiely for disagreeing with the ALJ at the hearing that child-rearing and work situations were comparable, *see* AR 566-67, as the ALJ references this in his decision (AR 43-44).

The Court finds that the ALJ's discrediting Dr. Kiely's opinions due to this disagreement, and more importantly the ALJ's reliance on plaintiff's adoption and caring for children, are misplaced reasons for the findings made by the ALJ.  First, as a factual matter, the adoption of the children and the evidence regarding childrearing applied to a time outside the relevant period.  As noted, the relevant period was December 1992 through March 31, 1996.  Plaintiff had not adopted children, nor was she caring for children during that time period.  Plaintiff testified at the first hearing in July 1999 that she had adopted the first child approximately ten months before that

19

hearing (AR 511).  Thus, the adoption took place sometime in 1998, well after cessation of the relevant period.  Thus, any childcare activities referenced in plaintiff's testimony did not occur during the relevant period.

Moreover, in commenting on the relationship of plaintiff's childrearing activities to his perception of plaintiff's ability to work, the ALJ stated that "[i]t is simply not credible that someone in the vicious cycle of such debilitating pain three and four times a week as asserted by the claimant would assume the demands of raising a three month old along with a four year old."  (AR 44-45).  His statement reflects a failure to recognize that plaintiff testified several times that she has assistance in caring for the children, either from her husband, relatives or neighbors (AR 572-75).  Reliance on testimony that a clamant is capable of caring for children may provide evidence of the claimant's ability, but such evidence loses weight if there is no finding that the claimant performs such activities "alone" and without significant assistance.  *See Reinertson v. Barnhart*, 127 Fed. Appx. 285, 288 (9th Cir., Apr. 1, 2005).

Moreover, while an ALJ is free to take into account a claimant's testimony about her daily activities in making an assessment as to the level of the claimant's pain or other subjective symptoms, *see* 20 C.F.R. § 404.1529(c)(3)(I), he is not free to equate such daily activities as taking care of children to "substantial gainful activity."  *See* 20 C.F.R. § 404.1572(c).

For these reasons, the Court finds that the ALJ did not give proper weight to the medical opinions of Dr. Kiely in determining plaintiff's residual functional capacity, specifically his opinions that plaintiff is restricted from a work situation where she would

have to sit, stand or walk for long periods of time, or for more than two to three hours per day, without moving around and taking walks; that her attendance at work is unpredictable as her pain and fatigue are unpredictable, and that she therefore could only work in a situation where she had the "flexibility" to meet her needs to move around or miss work as required.

**B.      Whether the Commissioner Carried Her Burden at Step Five**

Because the plaintiff was found to lack the RFC to return to her prior relevant work, the ALJ correctly found that burden shifted to the Commissioner to show that there were other jobs, existing in significant numbers, which she could perform (AR 45). *See Williams v. Bowen, supra,* 844 F.2d at 751 ("The burden of proof is now shifted to the Secretary. . . . [T]he claimant is entitled to benefits if the Secretary cannot establish that the claimant retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy.") (internal quotation marks and citations omitted).  If an ALJ's decision does not show that the Commissioner carried this burden of proof to show that there are jobs in the regional and national economies that the claimant can perform, the determination is subject to reversal.  *Vail v. Barnhart,* 84 Fed. Appx. 1 **3 (10th Cir., Nov. 26, 2003).

Here, the ALJ found that the Commissioner met this burden given the residual functional capacity found by the ALJ, and the evidence provided by the vocational expert of four possible jobs plaintiff could perform which supposedly existed in significant numbers (AR 45-46).  However, a vocational expert's testimony may provide a proper basis for an ALJ's determination at step five only when a claimant's

impairments are adequately reflected in the hypothetical posed to the expert.  *Vail,*

*supra*, 84 Fed. Appx. at **4, citing *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir.

1991), which states that "[t]estimony elicited by hypothetical questions that do not

relate with precision all of a claimant's impairments cannot constitute substantial

evidence to support the Secretary's decision."  An ALJ is required to accept, and to

include in his hypothetical questions, limitations supported by the record.  *Vail, supra*,

84 Fed Appx. at **4.  Here, the hypothetical posed to the vocational expert failed to

"adequately reflect" or "relate with precision," or "include," all of the plaintiff's

impairments and limitations as supported by the record, in at least two important

aspects.

First, as indicated above, the ALJ's failure to credit the testimony of plaintiff's

treating physician as to the additional limitations on plaintiff's ability to work led the ALJ

to omit those restrictions from plaintiff's RFC as presented to the vocational expert.

*See* AR 592-93.  For example, the ALJ did not include a restriction that plaintiff be

limited to sitting, standing or walking no more than two hours per day, that she be able

to move around and take walks at will, or that she would have to miss work as required

due to unpredictable pain and fatigue.  When such restrictions of sitting, standing or

walking no more than two to three hours per day were included in the hypothetical as

rephrased by plaintiff's counsel, the vocational expert testified unequivocally that

plaintiff could not perform any jobs (AR 599).

In addition, while the ALJ did attempt to address plaintiff's need to move around

to alleviate her pain, and he did include in his hypothetical the limitation that plaintiff

"be able to alternate from the seated position to standing and walking as needed" (AR 593), he still omitted to include the limitation of two to three hours of sitting, walking and standing in one day.  Moreover, it appears from the record that the vocational expert may have been confused about the nature of the restrictions regarding sitting, standing and walking (AR 593-95).

The vocational expert testified, nonetheless, that based on the RFC as presented to her, plaintiff was able to perform the jobs of call out operator, information clerk, surveillance system monitor and furniture rental consultant (AR 595-96).  The VE further explained that the first three of these positions is sedentary (AR 596).  She further explained that plaintiff's needs to move about while working the first three positions could be accommodated somewhat by a telephone headset (AR 597-98).  However, she acknowledged that there is a limit to the distance one can move away from a screen or device to which the headset is attached (AR 598).  However, the ALJ did not qualify or quantify plaintiff's ability to perform these jobs given this headset distance limitation, and the testimony of plaintiff's physician that she may need to take long walks and move about extensively at work.

Here, the ALJ expressly found that plaintiff "was unable to perform the full range of light work" but was capable of making an adjustment to other work (AR 49).  When an ALJ finds that a claimant cannot perform the full range of a particular exertional category, such as light work, his description of his findings in the hypothetical "must be particularly precise."  *Vail, supra*, 84 Fed. Appx. at **4.  As the *Vail* panel stated:

> For example, according to one of the agency's own rulings
> on sedentary labor, the description of an RFC in cases in
> which a claimant can perform less than the full range of work
> "must be specific as to the frequency of the individual's need
> to alternate sitting and standing."  Social Security Ruling
> 96-9P, 1996 WL 374185 (S.S.A.) at *7.  Precisely how long
> a claimant can sit without a change in position is also
> relevant to assumptions whether he can perform light work.
> 20 C.F.R. § 404.1567(b).

*Id.*  The circuit panel in that case also pointed out that when a claimant can perform

less than the full range of work in an exertional category, a vocational expert's

testimony about what jobs he could perform becomes particularly valuable.  *Id.*

Of course, the lack of a precise hypothetical would undermine the value of the

vocational expert's opinion.

        Here, the Court finds that the ALJ, even without regard to his failure to include

the opinion of Dr. Kiely, was far from precise in describing the limitations on plaintiff's

needs to move from sitting and standing positions.  Although he used the phrase

"postural shifting or changes as she was standing or walking" in an effort to describe

the limitation, he did not specify what timetable was implied in these restrictions, or

whether the changes could be made "at the will of the plaintiff" or how long plaintiff

would be engaged in the postural changes, or how far she might have to move to

regain comfort.  *Cf. Vail, supra,* 84 Fed. Appx. at **3.  Had the ALJ been more precise,

he perhaps would have responded to the vocational expert's implicit limitation on the

distance plaintiff would be able to move from a work station given the headset distance

limits.  But the lack of precision in describing plaintiff's limitations or restrictions, and

the frequent use of the indefinite phrase "postural shifting" without real explanation of

what that entailed, renders questionable the value of the vocational expert's opinions as to the jobs plaintiff can perform.

Here, as in *Vail,* this Court is constrained to say that the ALJ did not support his decision with substantial evidence as it was his burden to do.  His hypothetical questions lacked key information, and the use of the vocational expert's testimony in his final decision suffers from important gaps in analysis.

However, unlike *Vail*, this Court does not believe that it is necessary to remand this case to the Commissioner.  Here, as noted above, the plaintiff's counsel rephrased the hypothetical to the vocational expert, including the limitation of sitting, standing and walking no more than two hours in a day. The vocational expert stated that such limitations ruled out any position for plaintiff (AR 599).  In addition, the ALJ himself asked the vocational expert whether there would be any jobs claimant could perform if he accepted the limitations she herself testified to, which this Court understands to be consistent with Dr, Kiely's testimony, the vocational expert stated that there would be no jobs plaintiff could perform (AR 598-99).

Accordingly, the Court finds that substantial evidence in the record supported a finding that plaintiff was disabled during the relevant period, and such a finding should have been made.  Given this conclusion, the Court need not address the other arguments made by plaintiff.

**CONCLUSION**

For the above reasons, the Court finds that the Commissioner failed to sustain her burden at step five to demonstrate that there are jobs in the regional and national

25

economies that the claimant can perform.  Therefore, the decision of the Commissioner

must be REVERSED.  The Court finds that plaintiff met her burden to show that she

was disabled and accordingly appropriate benefits for the relevant period are hereby

AWARDED.

      DATED: February 13, 2006

                                    BY THE COURT:

                                    *s/ Phillip S. Figa*

                                    _____

                                    Phillip S. Figa
                                    United States District Judge